[Cite as *Wheeler v. Durrani*, 2026-Ohio-2475.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

DEBRA ANN WHEELER and : APPEAL NO. C-250095
RICHARD J. BROREIN, TRIAL NO. A-1706556
Successor Coexecutors of the Estate of :
Richard and Eileen Brorein,

    Plaintiffs-Appellees, :

  vs. :

ABUBAKAR ATIQ DURRANI, M.D., :

  and :

CENTER FOR ADVANCED SPINE :
TECHNOLOGIES,
:
    Defendants-Appellants.

---

KYRA MCCLENDON, : APPEAL NO. C-250206
TRIAL NO. A-1506695
    Plaintiff-Appellee, :

  vs. :

             *JUDGMENT ENTRY*

ABUBAKAR ATIQ DURRANI, M.D., :

  and :

CENTER FOR ADVANCED SPINE :
TECHNOLOGIES,
:
    Defendants-Appellants. :


This cause was heard upon the appeals, the records, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/30/2026 per order of the court.**

**By:**_____

      **Administrative Judge**

[Cite as *Wheeler v. Durrani*, 2026-Ohio-2475.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

DEBRA ANN WHEELER and RICHARD J. BROREIN, Successor Coexecutors of the Estate of Richard and Eileen Brorein,

    Plaintiffs-Appellees,

  vs.

ABUBAKAR ATIQ DURRANI, M.D.,

  and

CENTER FOR ADVANCED SPINE TECHNOLOGIES,

    Defendants-Appellants.

:      APPEAL NO. C-250095
:      TRIAL NO. A-1706556

---

KYRA MCCLENDON,

    Plaintiff-Appellee,

  vs.

ABUBAKAR ATIQ DURRANI, M.D.,

  and

CENTER FOR ADVANCED SPINE TECHNOLOGIES,

    Defendants-Appellants.

:      APPEAL NO. C-250206
:      TRIAL NO. A-1506695

*O P I N I O N*

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: June 30, 2026

*Statman Harris, LLC, Alan J. Statman* and *Benjamin M. Maraan II*, for Plaintiffs-Appellees,

*Taft Stettinius & Hollister LLP, Philip D. Williamson, Aaron M. Herzig* and *Russell S. Sayre*, for Defendants-Appellants.

**CROUSE, Judge.**

{¶1}     In these consolidated appeals, we are again confronted with the issue of whether the trial court erred in joining for trial two medical-malpractice actions against defendants-appellants Dr. Abubakar Atiq Durrani and the Center for Advanced Spine Technologies, Inc., ("CAST") (collectively referred to as "Appellants").[1]

{¶2}     Following our review of the record, we hold that the claims brought by plaintiffs-appellees Debra Ann Wheeler and Richard J. Brorein, Successor Coexecutors of the Estate of Richard and Eileen Brorein, and Kyra McClendon (collectively referred to as "Appellees") did not share common questions of law or fact and that the trial court erred in joining them for trial. We further hold that the trial court erred in admitting testimony about a surgery performed by Durrani on McClendon that was not the basis of the medical-malpractice action; in allowing Dr. Ranjiv Saini, an expert witness for Appellees, to testify outside the bounds of his expertise; and in allowing the jury to see a slide in Dr. Saini's PowerPoint presentation that referred to unrelated surgeries performed by Durrani.

{¶3}     Collectively, these errors cannot be found harmless. We accordingly reverse the trial court's judgments and remand this cause for new, separate trials for the plaintiffs.[2]

---

[1] We sua sponte consolidate these separate appeals into a single opinion and judgment.

[2] Appellees filed motions to dismiss their fraud claims, which were denied by a motions panel of this court because the motions failed to state with particularity the grounds upon which they were based and because they appeared to request relief that this court cannot afford. Both Appellants and Appellees filed supplemental briefs on the issues raised in the motions. Appellees also filed "notice[s] of withdrawal" of their motions to dismiss the fraud claim, which were struck by a motions panel of this court. We decline to revisit our denial of the motions. If Appellees wish to withdraw their fraud claims, they may do so in the trial court.

### I.  Factual and Procedural History

**{¶4}** On December 9, 2015, McClendon, along with her parents Tonya and Tony McClendon, filed a medical-malpractice action against Durrani and CAST.[3] The complaint alleged that Durrani performed a stapling procedure on McClendon's thoracic spine to correct her scoliosis, and that when the curvature of her spine subsequently worsened, he performed a spinal fusion on her. It further alleged that the surgeries were medically unnecessary and improperly performed.

**{¶5}** On December 7, 2017, an amended complaint was filed by Richard Brorein, as Executor of the Estate of Eileen Brorein, against Durrani and CAST.[4] The complaint alleged that Durrani performed a thoracic spinal fusion on Eileen[5] that was medically unnecessary and that the surgery was improperly performed, requiring Durrani to perform a revision surgery to correct the deficiencies.

**{¶6}** In October 2018, following the death of Richard Brorein, Debra Ann Wheeler and Richard J. Brorein were substituted as the coexecutors of the estate of Richard and Eileen Brorein.

### A.  Consolidation and Pretrial Filings

**{¶7}** Over Durrani and CAST's objection, the claims asserted by Eileen's estate and McClendon were joined for trial.

**{¶8}** Prior to trial, Durrani and CAST filed a motion in limine to preclude, as relevant to this appeal, the admission of (1) evidence of other malpractice lawsuits against Durrani, as well as evidence of Durrani's treatment of other patients, (2)

---

[3] The complaint also asserted claims against Cincinnati Children's Hospital Medical Center, UC Health, and West Chester Hospital, LLC, but McClendon settled with these defendants and the claims against them were dismissed.

[4] Claims were also filed against UC Health and West Chester Hospital, LLC, but a settlement was reached with these defendants and the claims against them were dismissed.

[5] Because there are multiple persons involved in the action with the surname Brorein, we refer to Eileen Brorein by her first name to avoid confusion.

surgical-standard-of-care testimony from Dr. Saini, (3) evidence of Durrani's flight to Pakistan and his absence from trial, and (4) evidence about the medical criminal action against Durrani. They filed a second motion in limine to preclude the McClendons from presenting the testimony of Dr. Charles Mehlman because he had only been identified as an expert "on all Children's cases" and McClendon's treatment at Cincinnati Children's Hospital Medical Center ("CCHMC") was no longer at issue, as the claims against CCHMC had been dismissed.

**{¶9}** The trial court orally ruled on the motions in limine at the beginning of trial. It granted the first motion in limine with respect to the admissibility of evidence regarding Durrani's treatment of other patients, other malpractice lawsuits, and the medical criminal action against Durrani. But the trial court denied the motion in limine with respect to Dr. Saini's testimony on surgical standards of care and Durrani's absence from trial. With respect to Dr. Saini, it stated, "Well, pursuant to the Court of Appeals' decision stating that based upon Dr. Saini's background and his training of orthopedic surgeons, he was qualified to testify as to surgical standards to a certain degree. And the Court will allow him to so testify."

**{¶10}** The trial court heard further arguments from the parties on the motion in limine regarding the testimony of Dr. Mehlman, and it held that it would allow Dr. Mehlman to testify. The court also denied Durrani and CAST's renewed objection to the joinder of the two cases for trial. A jury trial was then held on the claims of McClendon and Eileen's estate for negligence, fraudulent misrepresentation, battery, and lack of informed consent.

### B. Trial Testimony

#### 1. Eileen Brorein

**{¶11}** The evidence presented at trial established Eileen had suffered back

pain for well over a decade before being referred to Durrani. She had already seen multiple doctors for this pain and had treated it with conservative care, including medication, physical therapy, and steroid injections. Eileen was able to obtain only temporary relief from these treatments. At the time she presented to Durrani, she suffered pain in her back and her right shoulder. Her ability to enjoy life was good, but she needed assistance with many household tasks.

{¶12} The evidence established that during his initial consultation with Eileen, Durrani recommended surgery. Based on his examination of her medical images, he determined that she suffered a significant kyphotic deformity, thoracic spinal and foraminal stenosis, and a large disc herniation at T5-6, T6-7, and T7-8 that was causing very significant spinal cord compression. Durrani subsequently performed a laminectomy and a fusion of Eileen's spine from levels T3 to T10.

{¶13} Following the surgery, Eileen developed complications related to the hardware that Durrani had placed. She could feel the rods poking into her skin and experienced much discomfort. Imaging studies showed that the screws in her spine were starting to back out. Durrani recommended a revision surgery to correct this issue, which allegedly resulted from osteoporosis in Eileen's bones. Durrani performed the revision, removing the hardware that had been placed during the first surgery and putting in different screws. Following the second surgery, Eileen experienced pain worse than what she had suffered prior to either surgery.

{¶14} Eileen passed away from unrelated causes approximately two years after the second surgery.

### 2. Kyra McClendon

{¶15} The evidence presented at trial established that in 2008, McClendon, then age ten, was referred to CCHMC by her primary-care physician for concerns of

8

scoliosis. She was seen by Durrani at CCHMC, where he worked at the time.

{¶16} After ordering and examining an X-ray of McClendon's spine, Durrani presented the McClendons with three options: (1) ignore the curvature, which would eventually cause McClendon's spine to collapse her lung, (2) have McClendon wear a back brace nearly 24/7 for the rest of her life, or (3) have McClendon undergo a noninvasive surgery involving the stapling of her spine. The McClendons felt that surgery was their only option. Unbeknownst to them, McClendon's surgery was the first time that the stapling procedure had been performed at CCHMC.

{¶17} After a few post-surgery visits, McClendon did not see Durrani for a two-year period. In 2010, after her primary-care physician noticed that her scoliosis had progressed, McClendon followed up with Durrani at CAST, where he was employed at the time. Durrani viewed updated images of McClendon's spine and told her that she needed a spinal fusion. He said that she would be able to return to her activities of choice, tumbling and cheerleading, several months after surgery. Durrani performed a spinal fusion on McClendon from levels T3 to L2, although, prior to surgery, he had indicated that the fusion would extend to L3. During the surgery, he fused only six of the 11 impacted segments of McClendon's spine. He also used a bone morphogenetic protein on McClendon during the surgery, despite not informing McClendon or her parents that he intended to do so.

{¶18} After her surgery, McClendon experienced pain in the area around her hip. Durrani believed the pain was caused by an issue with her hips and that it was not related to the fusion surgery. McClendon also treated with two other doctors for this pain. One attributed the pain to her spine, while the other attributed it to the weight of the hardware Durrani had placed in her back. The pain eventually improved after McClendon participated in physical therapy. She was able to return to gymnastics, but

not on the competitive level that she had participated in prior to surgery. McClendon, who was 25 at the time of trial, stated that she had "good days and bad days" and that she had experienced pain off and on for the past 15 years.

### C. Appellees' Expert Testimony

{¶19} Appellees presented expert testimony from three witnesses, Dr. Stephen Bloomfield, Dr. Mehlman, and Dr. Saini.

### 1. Dr. Bloomfield

{¶20} Dr. Bloomfield opined that Durrani had exaggerated the findings on Eileen's medical images and that Durrani's reading of those images was outside of the standard of care. He testified that, contrary to Durrani's representations, Eileen's medical images did not show that her spinal cord was compressed. Dr. Bloomfield also opined that it was a violation of the standard of care for Durrani to recommend surgery for Eileen on her first visit. He also testified that Durrani breached the standard of care by performing surgery to decompress a spinal cord that was not significantly compressed, and that Eileen's pain and suffering was directly and proximately caused by Durrani's deviation from the standard of care.

### 2. Dr. Mehlman

{¶21} Prior to Dr. Mehlman's testimony, Durrani and CAST asked the trial court to verify that Dr. Mehlman would not be permitted to testify about whether the stapling procedure that Durrani performed on McClendon at CCHMC met the standard of care, because the claim related to that surgery had been settled with CCHMC and was no longer part of the case. Appellees' counsel argued that Dr. Mehlman would need to comment on the first surgery to explain why it led to the necessity for the second surgery.

{¶22} The trial court instructed Appellees' counsel not to question Dr.

Mehlman about whether the first surgery met the standard of care.

{¶23} Dr. Mehlman testified about the curvature of McClendon's spine upon her initial presentation to Durrani. He stated that she would have been a candidate for bracing and that "[t]he standard of care for the country would be to offer bracing for that child." Durrani and CAST objected. The trial court sustained the objection and instructed the jury to disregard the previous question and answer.

{¶24} Dr. Mehlman testified that when the stapling procedure was performed on McClendon, it was not a procedure that was regularly performed by pediatric orthopedic surgeons. Dr. Mehlman subsequently repeated this sentiment, stating that the stapling procedure never "caught on" and was never regularly performed. Upon objection from Durrani and CAST, the trial court told the jury, "There is a lot of discussion here about the first surgery that was performed on this plaintiff. Testimony is being allowed because it's necessary to set the basis for the surgery that's involved in this case, which was the second surgery. So please keep that in mind."

{¶25} Dr. Mehlman testified that Durrani breached the standard of care when performing the fusion surgery on McClendon because he did not fuse all 11 segments in McClendon's spine and because he used a bone morphogenetic protein off-label on her. He explained that the bone morphogenetic protein had not been approved by the FDA for use on minors, and that it carried side effects such as infertility, cancer, and excessive bone growth in abnormal places. He further testified that the fusion surgery left McClendon at risk for adjacent segment disorder, and that there was a high likelihood she would have future problems and pain associated with the spinal fusion.

{¶26} Dr. Mehlman's testimony addressed the staples that Durrani had used in the stapling procedure on McClendon's spine. He stated that Durrani's use of Medtronic staples was "completely off-label." Dr. Mehlman also opined that the

informed-consent form for McClendon's spinal fusion did not meet the standard of care because it did not list the name of the procedure that was to be performed and did not discuss any risks or complications associated with the procedure. He further stated that a separate form signed by McClendon's mother, referred to as an "acknowledgement of consent," also failed to list the risks and benefits of the surgery.

### 3. Dr. Saini

{¶27} Dr. Saini, a neuroradiologist, provided opinions about the surgeries performed on both Eileen and McClendon. He utilized a PowerPoint presentation during his testimony. As the parties agree, one of Dr. Saini's slides contained statements from a physician not involved in the lawsuit indicating that Durrani had performed unnecessary surgeries and was engaged in criminal activity. When that slide was presented, Appellees' counsel immediately said, "Let's take that down for a second, please."

{¶28} At a sidebar, Appellees' counsel explained that he noticed that the slide had not been redacted and that he needed to "black out the information about [Durrani's] unnecessary surgeries." Appellants' counsel moved for a mistrial, arguing that there was a high likelihood that the jury saw the slide, which counsel represented had stated that "[i]t is noted that since that time he has been charged with criminal activity regarding unnecessary surgeries." The trial court denied the motion for a mistrial, stating, "Number one, the Court was looking at the exhibit also, and I don't know what it said. I realize that my reading it, and looking at it, observing it may not be the same as the jurors. But the length of time that it was up and the opportunity to observe it was, in the Court's opinion, insignificant."

{¶29} Upon resumption of his testimony, Dr. Saini opined that Durrani breached the standard of care when reading Eileen's medical images. He testified that

Eileen did not have severe central canal stenosis, that her spinal cord had room to move, and that the images did not show that she suffered from severe kyphosis.

{¶30} With respect to McClendon, Dr. Saini testified that the stapling procedure Durrani performed on her was experimental at the time it was performed, and that it was the first procedure of that nature performed at CCHMC. He also testified that Durrani used Medtronic staples, rather than Nitinol staples, and that this contributed to the failure of the stapling procedure. Dr. Saini criticized Durrani's decision to only fuse six of the levels in McClendon's spine during the fusion surgery. He stated that without pedicle screws at each level, motion between the segments could not be stopped to allow fusion to occur.

{¶31} Dr. Saini testified that the informed-consent form signed by McClendon's mother for the spinal fusion did not meet the standard of care because it did not list the name of the procedure to be performed or the risks and benefits and pros and cons of the surgery.

### D. Appellants' Expert Testimony

{¶32} Durrani and CAST presented expert testimony from two witnesses, Dr. Michelle Hansman Whiteman and Dr. Paul Kaloostian.

#### 1. Dr. Hansman Whiteman

{¶33} Dr. Hansman Whiteman, a neuroradiologist, testified that Durrani's interpretation of Eileen's medical images was reasonable and within the standard of care. She stated that Durrani correctly determined that Eileen's spinal cord was compressed at three levels, and that he did not exaggerate radiographic findings.

{¶34} With respect to the stapling procedure that Durrani performed on McClendon, Dr. Hansman Whiteman testified that, at the time that it was performed, stapling was equally as efficacious as bracing. She stated that McClendon's scoliosis

improved significantly after the stapling before it began to progress again two years later. Dr. Hansman Whiteman discussed the fusion surgery performed on McClendon and stated that Durrani had obtained a "very beautiful result" compared to McClendon's preoperative curvature.

### 2. Dr. Kaloostian

**{¶35}** Dr. Kaloostian, a neurosurgeon, testified that Durrani met the applicable standard of care in his treatment of both Eileen and McClendon. With respect to Eileen, he stated that it was reasonable to recommend a spinal fusion and that the procedure was medically indicated based on Eileen's presentation to Durrani, including the facts that she had osteophytes pushing on her spinal cord and significant kyphotic deformity. He further testified that it was not against the standard of care to recommend surgery to Eileen on her first visit, particularly because she had exhausted conservative-care treatment.

**{¶36}** With respect to McClendon, Dr. Kaloostian testified that stapling was a recognized procedure at the time it was performed. As for the spinal fusion Durrani had performed on McClendon, Dr. Kaloostian stated that it was not a breach of the standard of care to use a bone morphogenetic protein on a minor scoliosis patient. Dr. Kaloostian further testified that Durrani's surgery improved McClendon's condition and did not proximately cause her any harm.

### E. Motion for Directed Verdict for Eileen's Estate

**{¶37}** After Durrani and CAST rested, they moved for a directed verdict on the claims brought by Eileen's estate. They argued that Debra Ann Wheeler and Richard J. Brorein, the successor coexecutors of Eileen's estate, were not proper plaintiffs because the estate had been closed. In support, Durrani and CAST introduced a certified copy of a January 2021 judgment entry from an Auglaize County Probate

Court closing Eileen's estate. They also filed a written memorandum arguing that the successor coexecutors lacked standing to maintain the action once the estate was closed.

**{¶38}** The trial court gave Appellees one day to respond. The trial then proceeded with closing arguments and jury instructions.

**{¶39}** When the parties returned to court the following day, Appellees introduced an amended judgment entry from the Auglaize County Probate Court. The entry provided that "[t]he Court *nun[c] pro tunc* reopens the estate at the date it was closed." (Emphasis in original.)

**{¶40}** Appellants objected to the late filing, arguing that no additional evidence could be introduced because the jury had already begun deliberating. They contended that although Eileen's estate had standing when the case was initiated, standing had to be maintained throughout the action, and it was not.

**{¶41}** Upon further questioning from the trial court, counsel for Durrani and CAST stated that he had learned of the estate's closure on August 4, 2022, which was four days prior to trial. The trial court questioned whether defense counsel had invited any error by waiting until the conclusion of trial to raise the issue.

**{¶42}** The court ultimately denied the motion for a directed verdict on the issue of standing. It stated,

> The issue is whether or not they maintain standing to pursue the action after January of 2021. And the Court is going to rely on its understanding of what a nunc pro tunc entry does. And it relates back to the date that's stated there, and the judge has stated that it was error or a mistake to dismiss the action in a nunc pro tunc, reinstates the action to the date that was on the initial dismissal or termination entry.

15

### F. Jury Instructions

**{¶43}** Included in the jury instructions were both an instruction regarding Durrani's absence from trial and an instruction regarding the stapling procedure performed on McClendon at CCHMC.

**{¶44}** With respect to Durrani's absence, the trial court instructed the jury that,

> The defendant, Dr. Durrani, has not attended these proceedings in person. He is represented here by counsel. You shall not speculate on why he is not present or consider his absence for any purpose except as instructed below. Dr. Durrani has voluntarily left the jurisdiction, removing himself from plaintiffs' ability to subpoena him for trial. When a party such as Dr. Durrani has relevant evidence or testimony within his or her control, and the party fails to produce that relevant evidence or testimony, that failure give[s] rise to an inference that the evidence or testimony is unfavorable to that party.

Regarding its ability, in general, to make an inference, the court instructed the jury, "Whether an inference is made rests entirely with you" and "[t]o infer or make an inference is to reach a reasonable conclusion of facts which you may, but are not required to, make from other facts which you find have been established by direct evidence."

**{¶45}** And with respect to the stapling procedure performed on McClendon, the following instruction was given to the jury:

> In Kyra McClendon's case, you've heard some testimony regarding the surgery she underwent at Cincinnati Children's Hospital Medical Center on May 2nd, 2008. You may not consider that surgery

for the award of damages. That testimony was provided to form the basis for the surgery of March 25th, 2011, at West Chester Hospital, which is the cause before you.

### G. Jury Verdicts

**{¶46}** The jury returned verdicts finding in favor of McClendon on her claims for negligence, lack of informed consent, battery, and fraudulent misrepresentation. It found that Durrani was negligent for recommending and performing the first surgery on McClendon, for having inadequate and inaccurate documentation, for using a bone morphogenetic protein on a minor, and for failing to meet the standard of care in the second surgery. The jury awarded McClendon a total $807,757.67 in both economic and noneconomic damages.

**{¶47}** With respect to Eileen, the jury returned verdicts in favor of her estate on the claims for negligence and fraudulent misrepresentation. It found that Durrani was negligent for exaggerating the amount of compression on Eileen's spinal cord and exaggerating her pain level during the initial diagnosis to justify surgery. The jury found in favor of Durrani on the claims for lack of informed consent[6] and battery. Eileen's estate was awarded a total of $500,246.04 in economic and noneconomic damages.

**{¶48}** While the jury deliberated on the issue of punitive damages, the parties discussed the jury's finding that Durrani was negligent in his care and treatment of McClendon for recommending and performing the spinal stapling surgery. Counsel for Durrani and CAST argued that they had objected repeatedly throughout trial to the introduction of evidence about the stapling procedure and that "the jury returned a

---

[6] Because the jury found in favor of Appellants on the informed-consent claim brought by Eileen's estate, we have omitted testimony pertaining to this claim from the opinion.

verdict against the instruction that you're not to award damages for the first surgery."

{¶49} In response, Appellees' counsel argued that the jury had been instructed that it could not consider the stapling procedure for purposes of damages, and that the jury's finding that Durrani was negligent in recommending and performing the stapling procedure did not establish that it had violated that instruction.

{¶50} The trial court elected to send the jury a question asking if it had considered the first surgery performed on McClendon when awarding damages. The jury answered that question in the negative.

{¶51} With respect to punitive damages, the jury returned verdicts awarding both McClendon and Eileen's estate $3,000,000 in punitive damages.

### H. Post-Verdict Motions

{¶52} Appellees filed motions for prejudgment interest. Durrani and CAST filed motions for a new trial and/or for judgment notwithstanding the verdict and for remittitur. As relevant to these appeals, the motions argued that the trial court erred by (1) joining the plaintiffs' cases, (2) denying Durrani and CAST's motion for a mistrial based on the display of an exhibit mentioning unnecessary surgeries and criminal charges against Durrani, (3) allowing Dr. Mehlman to testify, (4) denying Durrani and CAST's motion for a directed verdict on the issue of standing and the closure of Eileen's estate, (5) failing to direct a verdict on McClendon's claim for future medical expenses, and (6) providing an adverse-inference instruction to the jury. Durrani and CAST also filed post-trial motions for a setoff.

{¶53} The trial court denied the motions for a new trial and/or judgment notwithstanding the verdict. With respect to the issue of joinder, it found that there was sufficient commonality of issues and parties to warrant joinder. It noted that the evidence presented in both cases was that Durrani had exaggerated or falsified

18

diagnostic findings and that both cases involved the thoracic spine. It also found that no prejudice had resulted from the joinder because it had instructed the jury to consider each case separately and because the jury's finding in favor of Durrani and CAST on the claims brought by Eileen's estate for failure to obtain informed consent and battery demonstrated that the jury was able to parse through the evidence and reach independent conclusions.

{¶54} But the trial court found that Durrani and CAST were entitled to a reduction of the jury's award of noneconomic damages pursuant to R.C. 2323.43(A)(2), as well as a reduction of the award of punitive damages pursuant to R.C. 2315.21(D)(2)(b). The court also denied Durrani and CAST's motions for a setoff and, following a hearing, granted Appellees' motions for prejudgment interest.

{¶55} The trial court issued "final, appealable, orders" on January 22, 2025. But those orders did not include a final calculation of prejudgment interest, so the trial court issued entries setting forth the amount of prejudgment interest awarded on March 18, 2025. It also issued an order dismissing the claims of Tonya and Tony McClendon on April 2, 2025.

{¶56} Durrani and CAST now appeal, raising five assignments of error for our review. We address these assignments out of order.

## II. Standing/Real Party in Interest

{¶57} In their second assignment of error, Appellants argue that the trial court erred in failing to grant their motion for a directed verdict on the claims brought by Eileen's estate because there was no real party in interest who had standing to bring the claims after January 2021.

{¶58} As previously explained, Appellants moved for a directed verdict on the claims brought by Eileen's estate on the ground that the estate had been closed, so

19

there was no longer a real party in interest to assert the claims. They introduced a document from the Auglaize County Probate Court, dated January 20, 2021, reflecting that Eileen's estate was closed as of that date. The trial court gave Appellees overnight to respond, and, in the interim, allowed the jury to begin deliberating on all claims, including those brought by Eileen's estate. The following day, Appellees presented the trial court with an "amended judgment entry" from the Auglaize County Probate Court reflecting that the "[t]he Court *nun[c] pro tunc* reopens the estate at the date it was closed." (Emphasis in original.) The trial court denied the motion for a directed verdict, stating that it accepted the nunc pro tunc entry and the representations contained therein and concluding that the plaintiffs had maintained standing.

{¶59} We review a trial court's ruling on a motion for a directed verdict de novo. *Lally v. Mukkada*, 2011-Ohio-3681, ¶ 5 (1st Dist.). Pursuant to Civ.R. 50(A)(4), where "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party," the court shall direct a verdict for the moving party. *See also Lally* at ¶ 5.

{¶60} Appellants argue that this was not the proper use of a nunc pro tunc entry by the Auglaize County Probate Court. While we are sympathetic to this argument, we have no jurisdiction to review an entry issued by a lower court in a different county. *See* R.C. 2501.02(C) (an appellate court has jurisdiction "to review, affirm, modify, set aside, or reverse judgments or final orders of courts of record inferior to the court of appeals *within the district*" (Emphasis added.)); Ohio Const., art. IV, § 3(B)(2). In our review, we must accept the entry for what it purports to be. The trial court was required to do so as well.

20

**{¶61}** This assignment of error implicates the concepts of both real party in interest and standing. In *McCann v. Durrani*, 2023-Ohio-3953 (1st Dist.), this court engaged in a detailed discussion of both concepts. We explained that the party bringing suit must have standing to sue, that standing is a prerequisite to invoking the trial court's jurisdiction, and that "[s]tanding to sue must be determined at the time the action is filed, and its absence requires that the complaint be dismissed." *Id.* at ¶ 20. We further explained, "In addition to the standing necessary to invoke the jurisdiction of the court, the civil rules" require that all actions be prosecuted in the name of the real party in interest. *Id.* at ¶ 21; *see* Civ.R. 17(A) ("Every action shall be prosecuted in the name of the real party in interest.").

**{¶62}** On December 17, 2017, when the complaint pertaining to Eileen was filed, Richard Brorein, as the executor of the estate of Eileen Brorein, had standing to sue, and the jurisdiction of the trial court over the lawsuit was properly invoked. At that time, Richard Brorein was the real party in interest. When Richard Brorein passed away, his children Debra Ann Wheeler and Richard J. Brorein were named as successor coexecutors of the estate. They became the real parties in interest and were substituted as plaintiffs in this action. The estate was subsequently closed on January 20, 2021. Upon the closure of the estate, the former coexecutors of the estate were no longer real parties in interest. *See Schmidt v. Hicks*, 28 Ohio App. 413, 418 (1st Dist. 1928) (when an estate is closed, the executor is no longer a real party in interest and cannot bring or prosecute an action). So, at the time that the trial began on August 8, 2022, there was no real party in interest to pursue the claims. The question we must resolve is whether Appellees cured the real-party-in-interest issue with the nunc pro tunc entry from the Auglaize County Probate Court.

**{¶63}** *Lierenz v. Bowen*, 1994 Ohio App. LEXIS 43 (6th Dist. Jan. 14, 1994),

addressed a similar situation. In *Lierenz,* the plaintiff, "in her capacity as the executrix of an estate," filed a breach-of-contract lawsuit against defendants. *Id.* at \*2. While the litigation was pending, the probate court approved an entry that settled the decedent's account and discharged plaintiff as the executrix of the estate. *Id.* at \*3. The defendants moved to dismiss the plaintiff's complaint on the ground that she lacked authority to maintain the action after she was discharged as the executrix of the estate. *Id.* The trial court denied the motion to dismiss, the case proceeded to trial, and the jury awarded plaintiff damages. *Id.*[7]

**{¶64}** The plaintiff then filed a motion to reopen the estate, upon which the probate court "vacated its prior order discharging her as executrix retroactive to the date of her original appointment." *Id.* Defendants appealed the judgment in the contract action, challenging the trial court's denial of their motion to dismiss. *Id.* at \*4. The Sixth District reversed the lower court's judgment. It held that after the probate court order approved the settling of the estate over which plaintiff was the executrix, the plaintiff "was no longer the executrix of the estate and did not have the authority to maintain an action on behalf of the estate." *Id.* at \*5. The appellate court rejected plaintiff's argument that the probate court's order reopening the estate and vacating its discharge of plaintiff as executrix gave her authority to maintain the lawsuit. *Id.* at \*4-5.

**{¶65}** *Lierenz* lends credence to Appellants' argument that the trial court erred in failing to find that Debra Ann Wheeler and Richard J. Brorein no longer had authority to maintain the action on behalf of Eileen's estate. But we cannot fully endorse the reasoning of that court. While *Lierenz* seemingly implicated the concept

---

[7] The procedural history of this case is much more complicated, but it is not necessary to include the full history here.

22

of real party in interest, the opinion never referenced or cited Civ.R. 17, an error pointed out by the dissenting judge to that opinion. *See Lierenz* at *7-8 (Resnick, J., dissenting). And based on our reading of Civ.R. 17(A), we do not believe that reversal is warranted in this case.

**{¶66}** In addition to providing that all actions must be brought in the name of the real party in interest, Civ.R. 17(A) further states, "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest *until a reasonable time has been allowed after objection* for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." (Emphasis added.) Courts have held that "an action may not be dismissed because it has not [been] brought in the name of the real party in interest, unless the defendant first raises the objection and the plaintiff is thereafter afforded an opportunity to seek ratification by, or substitution or joinder of, the real party in interest." *Mikolay v. Transcon Builders, Inc.,* 1981 Ohio App. LEXIS 11690, *7 (8th Dist. Jan. 22, 1981); *see Foster v. Blue Cross/Blue Shield of Ohio*, 1997 Ohio App. LEXIS 5606, *5-6 (10th Dist. Dec. 11, 1997) ("Under this rule, once the trial court has sustained a challenge based on failure to prosecute in the name of the real party in interest, the named claimant must take prompt and immediate action to cure. If there is no attempt at cure, then the action should be dismissed.").

**{¶67}** Here, after Appellants raised the issue that the successor coexecutors were no longer the real parties in interest, the trial court gave Appellees time to respond. In accordance with the plain language of Civ.R. 17(A), this was an appropriate response. Further, the trial court's failure to rule on this issue as soon as it was raised cannot be evaluated in a vacuum. Durrani and CAST stated on the record that they learned the estate had been closed approximately four days before the trial began. Yet

rather than bring the issue to the court's attention at that time, they waited until the close of evidence to move for a directed verdict. This was plainly gamesmanship. In fact, the trial court questioned whether Appellants had invited any potential error by failing to timely notify the court and opposing party that the estate had been closed.

{¶68}   On this record and the circumstances before us, we find no error in the trial court's acceptance of the nunc pro tunc entry reopening the estate as of the date that it was closed and in the court's implicit determination that Appellees had cured the real-party-in-interest issue. We accordingly hold that the trial court did not err in denying Appellants' motion for a directed verdict and overrule the second assignment of error.

### III.  Motions for a Mistrial, New Trial, and Judgment Notwithstanding the Verdict

{¶69}   In their first assignment of error, Appellants argue that the trial court should have ordered new trials with single plaintiffs. This assignment of error raises a challenge to the denial of their motions for a new trial on the ground of improper joinder.  In their third assignment of error, Appellants argue that the trial court should have granted their motions for a mistrial, new trial, or judgment notwithstanding the verdict based on evidentiary issues. We address these assignments together.

{¶70}   A motion for a new trial pursuant to Civ.R. 59(A) may be granted for a variety of reasons, and the scope of our review is dependent upon the argument advanced in the motion. *Ravenscraft v. Durrani*, 2025-Ohio-2900, ¶ 95 (1st Dist.). Where the trial court's exercise of its discretionary authority is challenged, we employ a typical abuse-of-discretion standard of review. But where the motion for a new trial raises a legal issue, we conduct a de novo review. *Id.*

{¶71}   In a civil case, a motion for a mistrial is generally treated as a motion for

a new trial pursuant to Civ.R. 59(A). *Schultz v. Mayfield Neurological Inst.*, 2013-Ohio-4146, ¶ 10 (1st Dist.). A trial court's ruling on a motion for a mistrial is reviewed for an abuse of discretion. *Id.*

{¶72} We review de novo a trial court's ruling on a Civ.R. 50 motion for judgment notwithstanding the verdict. *Courtney v. Durrani*, 2025-Ohio-2335, ¶ 61 (1st Dist.). In doing so, we must view the evidence presented in the light most favorable to the nonmoving party. A Civ.R. 50 motion challenges the sufficiency of the evidence, and it should not be granted unless reasonable minds can reach only one conclusion and that conclusion is in favor of the moving party. *Id.*

{¶73} Appellants raise multiple challenges to the denial of their motions under these assignments of error. We address each in turn.

### A. Joinder

{¶74} We review the trial court's denial of the motion for a new trial on the grounds of improper joinder for an abuse of discretion, as the ruling implicates the trial court's exercise of its discretionary authority. *Ravenscraft*, 2025-Ohio-2900, at ¶ 95 (1st Dist.).

{¶75} Consolidation and joinder of civil actions is governed by Civ.R. 42(A)(1), which provides in relevant part that a court "may" join two actions for trial if they "involve a common question of law or fact." The rule requires two steps. First, a court must identify at least one common question—if no such question exists, the rule simply does not apply. Second, the court must make a determination that joinder is warranted. *See Wilson v. Durrani*, 2026-Ohio-2279, ¶ 51 (1st Dist.) ("In this regard, Civ.R. 42(A) establishes a two-step inquiry in determining when cases may be consolidated.") As indicated by the rule's use of permissive "may . . . [j]oin" language, this latter decision is discretionary. As part of that discretionary determination, a trial

court may consider the potential for prejudice resulting from joinder. *See, e.g., Stephenson v. Family Solutions of Ohio, Inc.*, 2024 U.S. Dist. LEXIS 220512, *7-8 (N.D. Ohio Dec. 5, 2024) (in determining whether to grant consolidation under Fed.R.Civ.P. 42, "courts weigh the interests of judicial economy against the potential for new delays, expense, confusion, or prejudice").

**{¶76}** Appellants argue that the trial court erred in determining that joinder was appropriate in the first instance, and that they were prejudiced by the improper joinder. Appellees provide no substantive response to these arguments, other than to simply state that joinder was appropriate. Their appellate brief is silent as to what common question of law or fact was present in the cases at bar to support joinder.

**{¶77}** Beginning with *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), this court has upheld the joinder for trial of two or three medical-malpractice actions against Appellants in multiple cases. In *Jones*, we held that the trial court did not abuse its discretion in finding a common question of fact between the two joined cases where each case involved "the jury's understanding of the specific conditions at issue in the L5-S1 area of the spine," where "a large amount of the expert testimony went to explaining the spine and these conditions generally," and where each plaintiff "presented the same claims against the same defendants based on the same theory of malpractice and/or fraud surrounding these conditions." *Id.* at ¶ 25.

**{¶78}** *Jones* was followed by a myriad of cases in which this court found no error in joinder. *See, e.g., Courtney v. Durrani*, 2025-Ohio-2335 (1st Dist.); *Ravenscraft*, 2025-Ohio-2900 (1st Dist.); *Fenner v. Durrani*, 2025-Ohio-4477 (1st Dist.); *Boggs v. Durrani*, 2026-Ohio-210 (1st Dist.). While our prior cases found the presence of a common question of law or fact, until recently we never explicitly discussed what, in fact, constitutes a common question of law or fact. In *Wilson*, 2026-

26

Ohio-2279 (1st Dist.), we endeavored to explain the meaning of this term.

**{¶79}** As we recognized in *Wilson*, there is a dearth of case law in Ohio defining the term "common question of law or fact" as used in Civ.R. 42(A). *Id.* at ¶ 49. In attempting to define this term, *Wilson* turned to *Director of Hwys. v. Kleines*, 38 Ohio St.2d 317 (1974), and Fed.R.Civ.P. 42. *See Wilson* at ¶ 54 and 58. In *Kleines*, the Ohio Supreme Court held that a trial court had erred in ordering consolidation of cases for trial when the cases did not share a common question of law or fact, but the court never defined that term. *Kleines* at 320.

**{¶80}** *Wilson* noted that, from *Kleines*, we can discern that *any* common question of fact will not suffice to support consolidation. Rather, the fact at issue must be material, rather than incidental or tangential. The *Kleines* Court also signaled that if a question of law is involved, the question should be one that is able to resolved in common, or uniformly, for all parties. *See Wilson* at ¶ 54 and 68.

**{¶81}** Fed.R.Civ.P. 42(a) contains language nearly identical to Ohio's Civil Rule regarding consolidation and joinder, as do other states' versions of Civ.R. 42. Like in *Wilson*, we find guidance in federal law and decisions from our sister states interpreting and discussing the various versions of Rule 42.

**{¶82}** In *Reedus v. McDonough*, 2022 U.S. Dist. LEXIS 37552 (N.D.Ind. Mar. 3, 2022), the court considered whether two actions that were separately filed by the same plaintiff should be consolidated under Fed.R.Civ.P. 42(a). It explained, "Though Rule 42 does not define a common question of law or fact, the plain meaning of this phrase indicates that a common question is one that must be answered identically in each case in which it is presented." (Cleaned up.) *Id.* at *6. The court found common questions of fact between the two cases regarding "Dr. Buckley's alleged harassment of Plaintiff and the VA's response or lack thereof." *Id.* at *7.

27

**{¶83}** In *Habitat Edn. Ctr., Inc. v. Kimbell*, 2008 U.S. Dist. LEXIS 46377, *11 (E.D.Wis. June 5, 2008), the court similarly held that, for purposes of Fed.R.Civ.P. 42(a), "a common question is one that must be answered identically in each case in which it is presented." In *Habitat*, the plaintiffs filed an action against various defendants challenging the approval of a timber project in a National Forest in Wisconsin. *Id.* at *4. The plaintiffs had also filed four additional actions against the defendants raising challenges to other timber projects, and they moved to consolidate four of the actions pursuant to Fed.R.Civ.P. 42(a). *Id.* at *4-5. The District Court found that the actions presented common questions of law and fact, explaining,

> First, all four cases raise the question of whether defendants should have considered the cumulative impacts of each project throughout the [Chequamegon-Nicolet National Forest], instead of focusing on a smaller region within the [National Forest]. While theoretically there could be different answers to this question depending on the project, in fact the answers will be the same because the projects' [Environmental Impact Statements] contain nearly identical discussions of the issue and rely on identical environmental data. Second, all four cases raise the question of whether defendants violated [the National Forest Management Act] by relying solely on habitat data, rather than actual population counts, in analyzing the projects' effects on the viability of sensitive species. The cases also present the issue of whether the habitat model provides accurate population estimates. Because the answers to these questions will not turn on differences in the projects' administrative records, the answers will be the same in each case.

(Cleaned up.) *Id.* at 15-16. After finding these common questions, the court proceeded to consider whether the benefits of consolidation outweighed the costs, and it determined that they did not. *Id.* at *16. It stated that a court must review each project based on its own administrative record, and that "[d]espite their similarities, the projects are different enough to require independent review," that "[c]onsolidated briefs and other filings would only complicate this already complex litigation by blurring the distinctions between the projects," and that "the cases are in slightly different procedural postures, and consolidation might delay the projects that are farthest along and might unnecessarily delay an appeal in a particular case." *Id.*

**{¶84}** In *Ex parte Novartis Pharmaceuticals Corp.*, 991 So.2d 1263, 1274-1275 (Ala. 2008), the Alabama Supreme Court considered whether the State of Alabama's fraud claims against two pharmaceutical companies were properly consolidated. It held, "The mere fact that two cases assert similar or the same theories of recovery *does not* constitute a common question of law so as to warrant consolidation." (Emphasis added.) (Cleaned up.) *Id.* at 1275. The court ultimately found that consolidation was appropriate based upon the "common question of fact as to whether the pricing information published in the third-party publications was material and whether the State, in fact, relied on that information." *Id.* This was a question that could be answered uniformly.

**{¶85}** Other cases that have held that there was a common question of law or fact have involved a single event with multiple victims. *See, e.g., Ferrari v. Impath, Inc.*, 2004 U.S. Dist. LEXIS 13898, *8-9 (S.D.N.Y. July 15, 2004) (finding common questions of both law and fact where all plaintiffs purchased shares of the defendants' stock and "relied upon materially false or misleading statements or omissions contained in various public, shareholder, and investor reports, released and prepared

29

by Defendants" and where each complaint was "*premised on the same facts* and statutory provisions" (Emphasis added.)); *Thayer v. Shearson, Loeb, Rhoades, Inc.*, 99 F.R.D. 522, 523 (W.D.N.Y. Feb. 3, 1983) (cases shared a common question of law or fact supporting consolidation, specifically, whether a stockbroker engaged in "churning" of the plaintiffs' stocks and whether the brokerage firm was aware of the individual broker's conduct); *Campbell v. Boston Science Corp.*, 882 F.3d 70, 74-75 (4th Cir. 2018) (upholding consolidation of four products-liability cases upon a finding of common questions of law or fact, including whether the product's design had been defective and whether its "directions for use provided sufficient warnings").

{¶86} We can glean from the above case law that a common question of law or fact is one that can be answered uniformly in each action. *Wilson*, 2026-Ohio-2279, at ¶ 59 and 68 (1st Dist.). Under this reasoning, a common question of law or fact would not be present merely because two actions brought by different plaintiffs involved the same claims against the same defendants or because two actions involved plaintiffs who had received a similar diagnosis or had surgery on the same or a similar area of the spine. These are *common facts* between two cases, but they do not present a *common question* of fact or law to be answered.

{¶87} We accordingly hold that when determining whether joinder is appropriate under Civ.R. 42(A)(1), a court must first determine whether the cases share a common question of law or fact, i.e., a question that may be answered uniformly without resorting to separate factual proof. *Id.* at ¶ 51. Only once it has found a common question can the trial court consider whether, in its discretion, it deems joinder to be warranted. *Id.* In exercising that discretion, the trial court might look at whether the joined actions will involve overlapping witnesses, the same core evidence, or facts arising out of the same interconnected events, and then weigh such efficiencies

against the risks of prejudice or administrative complications. *See Waterman v. Kitrick*, 60 Ohio App.3d 7, 14 (10th Dist. 1990) (after a common question of law or fact is found, "the court must determine if there is enough commonality of issues to warrant consolidation and if the parties are substantially the same"); *Campbell*, 882 F.3d at 74. Our prior cases addressing joinder have focused on the second step of this test, without analyzing the first.

**{¶88}** The claims brought by Eileen's estate and McClendon do not share a common question of law or fact to support joinder. The main theory underlying the claims brought by Eileen's estate was that Durrani had exaggerated the findings on Eileen's medical images to convince her to undergo an unnecessary surgery. In contrast, the theory underlying McClendon's claims was that Durrani had improperly performed her spinal fusion, specifically by failing to fuse all 11 levels of her spine that were involved in the fusion. None of the questions confronting the jury were amenable to a single answer applicable to both plaintiffs, based on identical evidence. Because the two actions do not present a question that can be answered uniformly or identically in each case, they lack the commonality required for joinder under Civ.R. 42(A). *See Reedus*, 2022 U.S. Dist. LEXIS 37552, at *6.

**{¶89}** Further, even if a common question of law or fact were present, the two actions simply lacked "sufficient commonality of issues and parties to warrant joining the cases." (Cleaned up.) *See Jones,* 2024-Ohio-1776, at ¶ 21 (1st Dist.); *Eghnayem v. Boston Science Corp.*, 873 F.3d 1304, 1314 (11th Cir. 2017) (consolidation is proper "where there is clearly substantial overlap in the issues, facts, evidence, and witnesses" involved in each case (Cleaned up.)). McClendon was a teenager who suffered from severe scoliosis. Durrani first performed a spinal stapling procedure on her, and then a spinal fusion on her thoracic and lumbar spine when the curvature in her spine

31

continued to worsen. The main allegations supporting her negligence claim were that Durrani used a bone morphogenetic protein off-label on a minor, he failed to fuse all affected segments of her spine with hardware, and he stopped the fusion at a different level of her spine than he had preoperatively indicated.

{¶90} In contrast, Eileen was in her mid-seventies and had experienced back pain for over a decade before seeking treatment with Durrani. Durrani diagnosed her as suffering from a significant kyphotic deformity, stenosis, and a large disc herniation at multiple levels of her thoracic spine that was causing very significant spinal cord compression. A laminectomy and fusion were performed on Eileen's spine. And when the hardware placed during the fusion began to loosen, Durrani had to perform a revision surgery. The main allegations supporting the negligence claim brought by Eileen's estate were that Durrani exaggerated the findings on her medical images to justify surgery and exaggerated her pain upon initial presentation, and that the fusion should not have been performed because of Eileen's osteoporosis.

{¶91} So, while McClendon and Eileen's estate advanced the same causes of action against the same defendants, the differences between their two underlying conditions and presentation were numerous (i.e., different ages, largely differing diagnoses, differing presurgery symptoms and treatment, and one had received a prior surgery while one necessitated a revision surgery). *Compare Courtney*, 2025-Ohio-2335, at ¶ 49 (1st Dist.) (holding that joinder was proper where plaintiffs "had similar diagnoses," "received essentially the same surgery," and alleged very similar conduct that led their surgeries). Further, the two plaintiffs did not rely on identical expert testimony. *See id.* Dr. Saini offered expert testimony on behalf of both McClendon and Eileen's estate, but because they had different diagnoses and suffered from different conditions, his testimony was not the same for each plaintiff. The Appellees' other two

experts did not testify for both plaintiffs. Dr. Mehlman testified that Durrani did not meet the standard of care with respect to McClendon, and Dr. Bloomfield testified that Durrani did not meet the standard of care with respect to Eileen.

**{¶92}** We accordingly hold that the trial court abused its discretion in finding that the claims brought by McClendon and Eileen's estate shared a common question of law or fact and in joining them for trial. A trial court's erroneous joinder will only serve as grounds for a new trial where the error was not harmless and where the party opposing joinder establishes prejudice. *See Luri v. Republic Servs., Inc.*, 2014-Ohio-3817, ¶ 9 (8th Dist.) (holding that a trial court's error in failing to bifurcate a claim pursuant to Civ.R. 42(B) required reversal only where the error was not harmless); *Adams v. Szczerbinski*, 2009 U.S. App. LEXIS 9899, *6 (7th Cir. May 6, 2009) (harmless-error standard in Fed.R.Civ.P. 61 required the court to disregard an erroneous consolidation of cases if the error was harmless and did not affect a litigant's substantial rights).

**{¶93}** However, we need not determine whether the trial court's error in joinder, standing alone, was harmless. Rather, we examine the impact of the error in conjunction with the other evidentiary errors that we hold the trial court committed, as discussed below. *See Setters v. Durrani*, 2020-Ohio-6859, ¶ 60 (1st Dist.) ("the doctrine of cumulative error applies in the civil context").

### B. Dr. Saini's PowerPoint Presentation

**{¶94}** Appellants argue that the trial court erred in failing to grant a mistrial after a slide in Dr. Saini's PowerPoint presentation stating that Durani had performed unnecessary surgeries and was engaged in criminal activity was displayed to the jury. The trial court declined to grant a mistrial, finding that the slide had been displayed for an "insignificant" amount of time and stating that the court itself, during the time

33

that the slide was displayed, had not comprehended or observed what it said.

**{¶95}** Prior to trial, the trial court granted Durrani and CAST's motion in limine to exclude any evidence that Durrani had been charged in a medical criminal action, as well as evidence regarding other malpractice lawsuits against Durrani. The display of the offending slide, as all parties agreed below, was in contravention of the trial court's ruling on the motion in limine and in error.

**{¶96}** As with the trial court's error regarding consolidation, we consider the impact of this error in conjunction with the other evidentiary errors committed by the court.

### C. Dr. Saini's Testimony

**{¶97}** Appellants argue that the trial court improperly allowed Dr. Saini to testify beyond his expertise as a radiologist in violation of Evid.R. 702.

**{¶98}** Evid.R. 702 provides that, among other requirements, a witness may testify as an expert when "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). An expert testifying in a medical-malpractice action "need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." (Cleaned up.) *Ravenscraft*, 2025-Ohio-2900, at ¶ 139 (1st Dist.). Whether a witness is qualified to testify as an expert is within the trial court's discretion. *Adams v. Durrani*, 2022-Ohio-60, ¶ 44 (1st Dist.), *overruled on other grounds by Fenner*, 2025-Ohio-4477 (1st Dist.).

**{¶99}** Challenges to Dr. Saini's testimony on this ground are not new to this court, as both the trial court and the parties are aware. When denying Appellants' motion in limine on this ground, the trial court stated, "[P]ursuant to the Court of

Appeals' decision stating that based upon Dr. Saini's background and his training of orthopedic surgeons, he was qualified to testify as to surgical standards to a certain degree. And the Court will allow him to so testify." This is a broad generalization of our prior holdings. A careful review of our case law on the issue of Dr. Saini testifying beyond his expertise does not establish a blanket rule on the permissibility of Dr. Saini's testimony. Rather, it establishes that the testimony must be evaluated on a case-by-case basis to determine whether it exceeds the scope of Dr. Saini's expertise as a radiologist. *Compare Potts v. Durrani*, 2023-Ohio-4195, ¶ 35-39 (1st Dist.) (determining that parts of Dr. Saini's testimony in that case exceeded the bounds permitted under *Adams*), *with Stephenson v. Durrani*, 2023-Ohio-2500, ¶ 72-73 (1st Dist.) (finding no error where "the trial court allowed Dr. Saini to testify within the bounds of *Adams*, while also appropriately striking improper testimony" beyond those bounds), *and Ravenscraft* at ¶ 141-144 (reviewing various statements in Dr. Saini's testimony at that trial and finding that all "fell within the scope of his expertise as a neuroradiologist").

{¶100} Appellants challenge multiple statements made by Dr. Saini. We find several of their challenges to be without merit, including their contention that Dr. Saini was improperly permitted to describe the clinical, rather than radiological, purposes for Eileen's surgeries. Dr. Saini explained the purpose of a laminectomy and what the procedure involved. He testified that he was a neuroradiologist, that he looked at films that occurred before, during, and after surgical procedures, and that he was tasked with having knowledge about the procedures to be performed. He stated that he was familiar with "the surgical process and procedure in various neurosurgical or spinal surgery techniques." We hold that the testimony describing how a laminectomy was performed, as well as the purpose of the surgery, was within his field of expertise.

{¶101} We further hold that Appellants' argument that trial court erred in allowing Dr. Saini to testify that Durrani improperly placed screws during Eileen's first surgery is without merit. On this point, Dr. Saini testified that a different radiologist had examined X-rays taken of Eileen after the first surgery and noted that the screws were not in place. Dr. Saini then used medical images to show where the screws had moved. He also testified that Durrani's post-operative statement identifying "prominence of proximal screws and rods" was an understatement because "[t]he top screws, especially on the right-hand side" had backed out a little bit. Appellants argue that Dr. Saini did not limit his screw-placement testimony to his experience as a radiologist.

{¶102} We cannot agree. First, Dr. Saini testified that it was a "daily routine" for him to opine whether an orthopedic spine surgeon correctly placed screws and rods. Second, Dr. Saini did not actually state that the surgery was improperly performed. Rather, he testified that a different radiologist examining Eileen's medical images had found that the screws were not in place. And he stated that, based on his own view of the images, the screws had moved out.

{¶103} Appellants raise several additional challenges to Dr. Saini's testimony, and we agree with their contention that, in offering this testimony, Dr. Saini exceeded the bounds of his expertise as a radiologist.

{¶104} Specifically, we hold that both Dr. Saini's testimony that correcting a kyphotic deformity "is hard to do" and his testimony criticizing the spinal fusion that Durrani performed on McClendon were improper. With respect to McClendon's fusion, Dr. Saini was critical of Durrani's failure to place pedicle screws at each level. He stated that this could result in "an aggravation of the scoliosis," "a lot of degenerative changes," or "problems with the nerves coming out." This testimony did

36

not fall within an area of knowledge that "cut across all specialty areas," but rather within the knowledge of a surgeon, and it exceeded the scope of Dr. Saini's expertise as a radiologist. *See Potts*, 2023-Ohio-4195, at ¶ 35 (1st Dist.).

**{¶105}** Appellants' final challenge to Dr. Saini's testimony pertains to his testimony about the stapling procedure performed on McClendon, including his criticism of the staples Durrani used and his statement that the surgery was experimental at the time that it was performed. We agree that this testimony was improperly admitted. Dr. Saini provided no testimony to establish that he was trained in identifying various types of staples used in neurological procedures or in the different types of surgeries used to treat scoliosis in 2008 based on the curvature of a patient's spine. Nor have Appellees made an argument that this information was within the expertise of a radiologist. Further, not only did this testimony fall outside the bounds of Dr. Saini's expertise, but, as discussed below, *any* testimony about whether Durrani failed to meet the standard of care when performing the stapling procedure was improper.

**{¶106}** We accordingly find that the trial court abused its discretion in allowing Dr. Saini to offer testimony outside the bounds of his expertise as a radiologist.

### D. Jury Instruction on Durrani's Absence

**{¶107}** Appellants next argue that the trial court improperly instructed the jury on Durrani's absence. This court has reviewed identical instructions in multiple cases, including *Jones*, 2024-Ohio-1776, at ¶ 30-40 (1st Dist.), *Courtney*, 2025-Ohio-2335, at ¶ 84-87 (1st Dist.), *Ravenscraft*, 2025-Ohio-2900, at ¶ 130-137 (1st Dist.), and *Fenner*, 2025-Ohio-4477, at ¶ 69-74 (1st Dist.). In all cases, we held that the instruction on Durrani's absence were erroneous, but determined that the error was harmless because the jury instructions as a whole did not mislead the jury. *Jones* at ¶

37

37; *Courtney* at ¶ 86-87; *Ravenscraft* at ¶ 136; *Fenner* at ¶ 74. We conclude likewise here, and we find no reversible error in the trial court's issuance of this instruction on Durrani's absence.

### E. Dr. Mehlman's Testimony

{¶108} Appellants contend that the trial court should not have allowed Dr. Mehlman to testify in McClendon's case because Appellees failed to disclose him as an expert until "mere days before trial."

{¶109} As previously set forth in this opinion, Appellants filed a motion in limine to preclude Dr. Mehlman from testifying because, they argued, he had only been identified as an expert "on all Children's cases" and McClendon's treatment at CCHMC was no longer at issue. They further contended that they were not provided an expert report from Dr. Mehlman and had not deposed him on this particular case. Appellants acknowledged that they had not deposed *any* of Appellees' expert witnesses in the case. But they explained that the other experts were deposed multiple times in the past, whereas Dr. Mehlman had never been deposed as a liability expert.

{¶110} Appellees argued that Dr. Mehlman had been initially identified as an expert on August 10, 2018. They argued that they had not received expert reports from any of the Appellants' experts on these cases and that the parties had agreed "that there would be no expert depositions." Appellees told the trial court that Appellants, similarly, had informed Appellees within the previous two weeks that Appellants would be calling a radiologist from Florida to testify, and that they had neither received a report from, nor deposed, this radiologist.

{¶111} Appellants conceded that Dr. Mehlman had been identified in the August 2018 filing, but they noted that he was identified as an expert on "all Children's cases" and that he had never been identified as someone who would comment on the

second surgery performed on McClendon. The trial court ultimately denied the motion in limine.

{¶112} We find no abuse of discretion here. The record indicates that Dr. Mehlman was listed as an expert on McClendon's case in an August 2018 filing. This filing stated that "[d]efense already have [Dr. Mehlman's] CV. Plaintiff previously disclosed Dr. Charles Mehlman as an expert on all Children's cases as a non-retained, non-paid expert based upon his deposition testimony." At the time of this filing, McClendon's claims against CCHMC were still pending. But in February 2020, all claims against CCHMC were dismissed.

{¶113} Even though Dr. Mehlman was listed in the August 2018 filing, Appellees seemingly agreed with Appellants' assertion that he was not disclosed as an expert witness in this case until several days before trial. Their argument that Appellants themselves had similarly disclosed an expert witness shortly before trial evinces this concession. Despite the apparent last-minute disclosure of Dr. Mehlman as an expert witness, the unique circumstances of this case support the trial court's decision to allow him to testify.

{¶114} The record establishes that the parties had, collectively, agreed not to depose the expert witnesses or to exchange expert reports. And Appellants never requested a continuance to depose Dr. Mehlman—they simply asked to have him excluded from testifying. These facts, coupled with the inclusion of Dr. Mehlman as an expert witness in the August 2018 filing, lead us to conclude that Appellants have failed to demonstrate how they were harmed by any last-minute disclosure of Dr. Mehlman. We therefore find no abuse of discretion in the trial court's decision to allow Dr. Mehlman to testify.

## F. Testimony About the Stapling Procedure Performed on McClendon

{¶115} Appellants' final argument is that the trial court erred in allowing testimony about a surgery not at issue in the trial, specifically the stapling procedure performed on McClendon at CCHMC. They argue that because McClendon had settled with CCHMC, any testimony regarding the stapling procedure was not relevant.

{¶116} Before Dr. Mehlman testified, the trial court ruled that testimony regarding the stapling procedure could be offered to provide background and context for the second surgery that was the subject of McClendon's claims, but that no testimony was allowed about whether Durrani met the standard of care when performing the stapling procedure. Despite this ruling, the court allowed McClendon to present testimony regarding the stapling procedure that exceeded the provision of background and context information.

{¶117} When discussing the stapling procedure, Dr. Mehlman testified that the "industry norm" and standard of care would have been to offer McClendon bracing. The trial court sustained an objection to this statement. Dr. Mehlman also testified that pediatric orthopedic surgeons were not regularly offering the stapling procedure to patients at that time and that the procedure never "caught on." He criticized the staples that Durrani had used during the procedure, stating that "this was a completely off-label use to put staples in the spine like this." He further testified, "[T]he staple procedure at the time this was done was experimental and highly questionable. And this has since been abandoned. No one does this procedure."

{¶118} Dr. Saini's testimony also addressed the stapling procedure. Like Dr. Mehlman, he testified that the procedure was experimental at the time that Durani performed it on McClendon. He also criticized the staples that Durrani used during the procedure and seemingly blamed the staples for the growth of McClendon's

scoliosis, stating that because of the staples used, "there is no arrest of bone on this side here." The trial court sustained an objection to this last statement.

{¶119} Recognizing the potential prejudice that this testimony could cause, the trial court gave a curative instruction to the jury in the middle of trial, explaining that testimony about the stapling procedure was being offered "to set the basis for the surgery that's involved in this case, which was the second surgery." It also provided a jury instruction reiterating that instruction and telling the jury that the stapling procedure could not be considered when awarding damages.

{¶120} This testimony offered about the stapling procedure was improper and irrelevant. The trial court recognized as much when it instructed Appellees that they could not elicit standard-of-care testimony regarding the stapling procedure. But the actual testimony admitted strayed far beyond the parameters that the trial court had set. We accordingly hold that the trial court abused its discretion in allowing the jury to hear repeated criticism of a surgery, performed on a minor, that was not the subject of any claims at trial.

### G. Cumulative Error

{¶121} We have found error in (1) the trial court's improper joinder of the claims asserted by McClendon and Eileen's estate for trial, (2) the jury's viewing of a slide in Dr. Saini's PowerPoint presentation stating that Durani had performed unnecessary surgeries and was engaged in criminal activity, (3) the trial court allowing Dr. Saini to testify beyond the bounds of his expertise in multiple instances, and (4) the trial court allowing testimony regarding the stapling procedure performed on McClendon. Appellants argue that the cumulative effect of these errors warrants a new trial.

{¶122} "An improper evidentiary ruling constitutes reversible error only when

the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 35. To determine whether an error affected a party's substantial rights, we must weigh the prejudicial effect of the error and ask whether the jury probably would have reached the same result had the error not occurred. *Bender v. Durrani*, 2024-Ohio-1258, ¶ 93 (1st Dist.).

{¶123} Collectively, these errors cannot be found harmless. The cases put on by both McClendon and Eileen's estate were close. The jury returned verdicts in favor of Durrani and CAST on several of the claims brought by Eileen's estate. Both cases essentially involved a "battle of the experts," with experts for each plaintiff criticizing Durrani's performance and experts for Durrani and CAST defending it.

{¶124} The trial court's improper joinder allowed the jury to hear claims from another plaintiff that would not otherwise have been admissible. *See Stephenson*, 2023-Ohio-2500, at ¶ 47 (1st Dist.) ("Ohio courts tend to recognize that absent a finding of malpractice, evidence of the existence of a prior medical malpractice case is properly excluded, as unfairly prejudicial." (Cleaned up.)). A jury deciding McClendon's claims heard otherwise inadmissible information regarding the surgery performed on Eileen, including that the surgery was not performed correctly and required a revision. It also heard about the extensive pain Eileen suffered. And in deciding the claims brought by Eileen's estate, the jury was allowed to hear otherwise inadmissible testimony that Durrani unsuccessfully performed a spinal fusion on a minor and that he used a bone morphogenetic protein off-label on her.

{¶125} Add in the improper testimony about the stapling procedure performed on McClendon and the improper testimony from Dr. Saini, and the resulting prejudice is even greater. Not only did the jury hear evidence about Durrani's alleged

malpractice against a second plaintiff, but it heard extensive, critical testimony about a surgery that was not the subject of the claims at trial. The resulting prejudice from this is reflected in the record, as the jury returned an interrogatory finding that Durrani was negligent for, among other reasons, recommending and performing the stapling procedure on McClendon. In other words, the jury found negligence based on a surgery *that was not the subject of the claims at trial*. Although the trial court issued a jury instruction on the stapling procedure in an attempt to avoid any resulting prejudice from the testimony about that procedure, the instruction was plainly ineffective. It only told the jury that the stapling procedure could not be considered when determining the award of damages, not in its determination of negligence. This was counter to the curative instruction that the court had provided to the jury during trial, which had stated that testimony about the stapling procedure was offered only for background and context.

{¶126} On this record, we cannot hold that the jury would have reached the same result had these errors not occurred. Because, cumulatively, the errors cannot be considered harmless, we hold that the trial court erred in denying Appellants' motions for a new trial and in failing to order new trials with single plaintiffs.

{¶127} We accordingly sustain the first assignment of error and the third assignment of error in part as to the trial court's denial of Appellants' motions for a new trial. The third assignment of error is overruled in all other respects. Appellants' remaining assignments of error, in which they challenge the trial court's failure to allow a setoff, the award of future medical damages to McClendon, and the awards of prejudgment interest, are therefore moot and we do not address them.

### IV. Conclusion

{¶128} For the foregoing reasons, the trial court's judgments are reversed. This

cause is remanded for new trials consistent with the law and this opinion.

Judgments reversed and cause remanded.

**BOCK, J.,** concurs.
**ZAYAS, P.J.,** concurs in part and concurs in judgment only in part.


**ZAYAS, P.J.,** concurring in part and concurring in judgment only in part.

{¶**129**} I concur with the judgment of the court, and I concur with most of the majority opinion. I write separately to articulate the proper analysis for determining when a "common question of law or fact" exists under Civ.R. 42. Rather than adopting a new framework for applying Civ.R. 42, I adhere to the plain meaning of the phrase "common question of law or fact" as the standard governing a trial court's exercise of its discretion to join matters for hearing or trial, consolidate actions, or issue any other orders to avoid unnecessary cost or delay.

{¶**130**} Applying ordinary definitions, two actions involve a common question of law when they share an issue concerning the interpretation or application of legal principles. Likewise, two actions involve a common question of fact when they share an issue requiring the resolution of a factual dispute. The existence of such a shared legal or factual issue satisfies the threshold inquiry under Civ.R. 42.

{¶**131**} Consistent with the purpose of the rule, trial courts have broad discretion to determine whether a common question of law or fact exists and whether resolving that question through a joint proceeding will promote efficiency without unfairly prejudicing the parties. Nothing more is required. Common questions are those capable of being addressed through the same procedure, thereby advancing judicial economy and reducing unnecessary expense or delay. Civ.R. 42 does not require that the common question ultimately yield the same answer in each action.

The rule contains no such limitation and imposing one would add language not found in the text of Civ.R. 42.

{¶132} Moreover, even if such a requirement were imposed, this court's prior precedent would satisfy that heightened standard. Accordingly, even under the majority's added requirements our existing case law would remain sound, controlling, and fully consistent with this newly determined application of Civ.R. 42.

{¶133} As this court has held in the past, where two malpractice actions present the same theory of malpractice based on identical representations made from the same defendant doctor regarding each plaintiff's respective medical imaging and history, and where *competing* expert testimony, from the same witnesses, is presented on *the applicable standard of care for making such representations*, a common issue of fact is created between the actions. *See, e.g., Jones v. Durrani*, 2024-Ohio-1776, ¶ 25-26 (1st Dist.); *Courtney v. Durrani*, 2025-Ohio-2335, ¶ 49 (1st Dist.); *Ravenscraft v. Durrani*, 2025-Ohio-2900, ¶ 88 (1st Dist.); *Fenner v. Durrani*, 2025-Ohio-4477, ¶ 49 (1st Dist.).

{¶134} Nevertheless, where, like here, the applicable standard of care for each plaintiff's theory of malpractice is different and the overlap in witnesses at trial for each action was miniscule in comparison to past cases that have come before this court, joining of the actions for trial strayed from this court's precedent and was improper where the actions lacked sufficient commonality to warrant the joint trial under Civ.R. 42.

{¶135} Accordingly, I concur with the judgment of the majority on the first assignment of error challenging the joint trial as I agree with the majority that the joint trial here was improper where the actions lacked sufficient commonality to warrant a joint trial, as more-fully explained below. I simply disagree with how to reach this

result. Beyond that, I concur with the remainder of the majority opinion.

## I. A Common Question of Law or Fact

## A. The Plain Language of Civ.R. 42

**{¶136}** Civ.R. 42(A) provides, "If actions before the court involve a common question of law or fact, the court may: (a) join for hearing or trial any or all matters at issue in the actions; (b) consolidate the actions; or (c) issue any other orders to avoid unnecessary cost or delay."

**{¶137}** Under the plain language of the rule, a trial court may take action under the rule when actions before it "involve a common question of law or fact."

**{¶138}** "Involve" is defined as "to have within or as part of itself," or "to require as a necessary accompaniment." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/involve (accessed May 21, 2026) [https://perma.cc/NS87-ZFUX].

**{¶139}** "Common" is defined as "belonging to or shared by two or more individuals or things or by all members of a group." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/common (accessed May 21, 2026) [https://perma.cc/GZY2-G2VX].

**{¶140}** "A 'question of law' is '"[a]n issue to be decided by the judge, concerning the application or interpretation of the law."'" *Wray v. Wessell*, 2016-Ohio-8584, ¶ 42 (4th Dist.), citing *Henley v. Youngstown Bd. of Zoning Appeals*, 2000-Ohio-493, ¶ 25, citing *Black's Law Dictionary* (7th Ed. 1999).

**{¶141}** "[A] 'question of fact' [is] '[a]n issue involving the resolution of a factual dispute and hence within the province of the jury in contrast to a question of law.'" *Id.*, quoting *Black's Law Dictionary*.

**{¶142}** Utilizing these plain-language definitions, two actions would "involve a

common question of law" where both actions have within them a shared issue concerning the application or interpretation of the law. *See Director of Hwys. v. Kleines,* 38 Ohio St.2d 317, 320 (1974) (holding that where, by statute, the parties must consent to the court's consolidation of appropriation cases for trial, the trial court cannot bypass this requirement and force the parties to join two appropriation actions for trial under Civ.R. 42 where "there appear[ed] to be no issues of law requiring judicial interpretation which [were] common to all the property owners.").

**{¶143}** Whereas two actions would "involve a common question of . . . fact" where both actions have within them a shared issue involving the resolution of a factual dispute. *See id.* at 320 (holding that where, by statute, the parties must consent to the court's consolidation of appropriation cases for trial, the trial court cannot bypass this requirement and force the parties to join two appropriation actions for trial under Civ.R. 42 where there was "no common interest in the ownership of the property to be appropriated" and the properties were not "being used for a common purpose.").

**{¶144}** Notably, by its plain language, Civ.R. 42 only requires that actions before the trial court involve a single common question of law *or* fact. *See Jones*, 2024-Ohio-1776, at ¶ 26 (1st Dist.), citing *Clemente v. Garnder*, 2004-Ohio-2254, ¶ 18 (5th Dist.) ("Civ.R. 42(A) does not require that all questions of law or fact be identical.").

**{¶145}** However, the existence of a common question of law or fact does not automatically warrant the joining of matters for hearing or trial, consolidation of actions, or the issuance of any other order under Civ.R. 42. The rule authorizes such measures only when they promote expedition, economy, or both. These considerations therefore serve as practical limitations on the exercise of a trial court's authority under Civ.R. 42.

**{¶146}** Civ.R. 42 applies broadly to "any or all matters at issue" and the

permitted actions under the rule are all governed by the same threshold requirement, a "common question of law or fact." Whether a particular action under the rule will advance judicial economy or efficiency necessarily depends upon the circumstances presented. For example, conducting a single qualification hearing for multiple cases involving the same expert and the same area of expertise may conserve judicial resources and avoid duplicative proceedings, even though full consolidation of these cases may not be warranted.

**{¶147}** Accordingly, "the thrust of Civ.R. 42(A) is to vest discretion in the [trial court] to determine whether consolidation [or any other action under the rule] is to be permitted where the circumstances specified in the rules exist." *Kleines*, 38 Ohio St.2d at 319. A construction of "common question of law or fact" that is unduly narrow would unnecessarily restrict a trial court's ability to utilize the various case-management tools provided by Civ.R. 42.

**{¶148}** Ultimately, the management of cases remains committed to the sound discretion of the trial court, provided that the rights of the parties are protected and the requirements of the rule are satisfied. *Id.* at 319-320; *see, e.g., Givens v. Longwell*, 2024 U.S. Dist. LEXIS 55074, *4-5 (S.D. Ohio Mar. 27, 2024), quoting *Advey v. Celotex Corp.*, 962 F.2d 1177, 1180 (6th Cir. 1992) (discussing the analogous Fed.R.Civ.P. 42 and stating, "'The underlying objective is to administer the court's business "with expedition and economy while providing justice to the parties."'").

### B. A Common Question of Law or Fact Under Other Civil Rules

**{¶149}** Use of the word "common" in relation to a "question of law or fact" is not unique to Civ.R. 42. Similar language is found in Civ.R. 20, 23, and 24.

**{¶150}** Under Civ.R. 20, a requirement for joinder of parties is that "any question of law or fact *common to all plaintiffs* will arise in the action." (Emphasis

added.)

**{¶151}** Under Civ.R. 23(A)(2), a prerequisite to a class action is that "there are questions of law or fact *common to the class*."[8]  (Emphasis added.)

**{¶152}** Under Civ.R. 24(b), a requirement for permissive intervention is that the proposed intervenor "has *a claim or defense that shares with the main action a common question of law or fact*."  (Emphasis added.)

**{¶153}** Note that, while these phrases may be similar, no two phrases under the rules are identical.

## C.  *The Importance of Considering the Purpose Behind the Rule at Issue*

**{¶154}** Because no two similar phrases under the rules are identical, it is important to consider the purpose for each rule when applying the phrase within the context of each rule as each phrase cannot be read in isolation or assumed to mean the same thing in each circumstance.

**{¶155}** For Civ.R. 42, the purpose "is 'to avoid unnecessary costs or delay' in the interests of judicial efficiency."  *Kleines*, 38 Ohio St.2d at 319; s*ee* 2005 Staff Note, Civ.R. 42 ("The obvious purpose of Rule 42(A) is for convenience of trial, for preventing multiplicity of actions, and for the saving of costs.").  Accordingly, the rule only requires that two or more actions involve *a single* common question of law or fact before the court may take action under the rule.  Importantly, even where two actions are consolidated under the rule, they retain their individual identity.  *See Hall v. Hall*, 584 U.S. 59 (2018) (discussing the analogous Fed.R.Civ.P. 42).

**{¶156}** A comparison with Civ.R. 23, governing class actions, is instructive.  A

---

[8] Because the commonality must be to the class, and there must be typicality in the class, it stands to expect that the common question of law or fact will have the same answer in this context.  *See generally Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011).  However, the same result is not warranted within the context of Civ.R. 42 as the rules support two completely different purposes. *See Wilson v. Durrani*, 2026-Ohio-2279, ¶ 99-113 (1st Dist.) (Moore, J., dissenting).

class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores,* 564 U.S. at 348, quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979). Because class actions depart from the ordinary model of individual litigation, Civ.R. 23 imposes stringent prerequisites before claims may be adjudicated collectively. As the United States Supreme Court has explained, "'[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" *Id.* at 348-349, quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). The rule's requirements of numerosity, commonality, typicality, and adequacy of representation serve to ensure that the claims litigated on a class-wide basis are sufficiently cohesive to warrant collective adjudication. *Id.* at 349.

{¶157} Consistent with that purpose, Civ.R. 23(A)'s commonality requirement focuses on whether the members of the proposed class share common questions whose resolution will advance the claims of the class as a whole. Indeed, the concept of commonality in the class-action context contemplates that the answer to the common question will generate a common resolution for the class members' claims. This requirement is sensible because a class action binds absent class members and permits representative litigation on their behalf. Thus, the common question must be capable of producing a common answer central to the validity of the claims being asserted.

{¶158} Civ.R. 42 serves an entirely different purpose. Unlike Civ.R. 23, it does not authorize representative litigation or bind absent parties. Rather, it is a case-management rule designed to promote efficiency and avoid unnecessary cost or delay. Accordingly, Civ.R. 42 requires only that actions "involve a common question of law or fact." Nothing in the rule suggests that the common question must yield the same answer in each action or produce a uniform outcome for all parties.

{¶159} Consider, for example, 20 separate actions in which the same expert witness is expected to testify.  If a dispute arises regarding the expert's qualifications, that issue presents a common question of law or fact within the meaning of Civ.R. 42 because the same question is implicated in each action.  A trial court could therefore, in its discretion, conduct a single hearing to resolve that issue.  Yet the existence of that common question would not satisfy Civ.R. 23's commonality requirement because the qualification of the expert is not a question where resolution would provide a common answer central to the merits of the class members' claims.

{¶160} This comparison illustrates why importing the class-action concept of a "common answer" into Civ.R. 42 would be misplaced.  *Contra Wilson*, 2026-Ohio-2279, ¶ 55-57, 65-68 (1st Dist.).  The two rules serve different functions and employ different language.  While Civ.R. 23's commonality requirement may reasonably demand a question capable of generating a common answer for the class, Civ.R. 42 contains no such requirement.  It requires only the existence of a common question of law or fact, leaving it to the trial court's discretion to determine whether addressing that question jointly will promote efficiency and fairness.

### D.  *The Common Question of Law or Fact Must Simply Be Relevant Under Civ.R. 42*

{¶161} The majority opinion concludes that the common fact at issue must be material, rather than incidental or tangential.  If the majority opinion simply means that the fact at issue must be relevant to the actions, i.e., must be a question that will have some sort of impact on the actions in question, then I agree.  However, to the extent that the majority opinion suggests that a "material" question is a question that will go beyond this and have some sort of substantial impact on the actions, such as a question that resolves an element of a claim, then I disagree.  Any such requirement

would convolute the requirement of a single question of law or fact with the broad discretion afforded to trial courts under the rule to consider whether consolidation or other permissible actions would prevent unnecessary costs or delay.

**{¶162}** While an issue may need to be more than just relevant to warrant a largely comprehensive action under Civ.R. 42, such as the joining of actions for trial or consolidation, this is due to the efficiency element of the rule and not based on any plain-language requirement. Rather, under the plain language of Civ.R. 42, if the trial court wanted to hold a joint hearing on an issue that is relevant and common to two actions, but not substantial, and it would be efficient for the court to do so, there is nothing in the rule that would prohibit this.

### E. A Common Question Will be Answered Uniformly

**{¶163}** The majority opinion concludes that a common question of law or fact is one that "may be answered uniformly without resorting to separate factual proof." It is unclear if the majority is suggesting that the process of answering the common question must be a uniform process, or that the common question must result in a uniform—i.e., identical—answer. To the extent that the majority is suggesting that a common question must be one that results in a common answer, I disagree as there is nothing in the plain language of the rule that would warrant such a result.[9]

**{¶164}** To the extent that the majority suggests that a uniform *process* is involved in answering a common question, I don't disagree simply based on the reality of answering a common question. The phrase "answered uniformly" refers to the process of reaching the answer — i.e., whether the question can be resolved through

---

[9] As stated above, because the commonality must be to the class under Civ.R. 23(A)(2), and there must be typicality in the class, it stands to expect that the common question of law or fact will have the same answer in this context. *See generally Wal-Mart,* 564 U.S. 338. However, the same result is not warranted within the context of Civ.R. 42 as each rule supports a completely different purpose. *See Wilson,* 2026-Ohio-2279, at ¶ 99-113 (1st Dist.), (Moore, J., dissenting).

common evidence and/or legal analysis. "Answered uniformly" is an action and focuses on the method of resolution, whereas a uniform "answer" is a noun that would require the same substantive outcome for all.[10] The word "answer" does not appear anywhere in the rule and I do not join the majority opinion in reading any such requirement into the plain language where such language does not exist. Rather, "answered uniformly" implicates that a uniform *process* is involved in answering a common question.

{¶165} For example, in *Reedus v. McDonough*, 2022 U.S. Dist. LEXIS 37552 (N.D.Ind. Mar. 3, 2022), cited by the majority, the United States District Court for the Northern District of Indiana considered the analogous Fed.R.Civ.P. 42 and stated that the "plain meaning" of the phrase "a common question of law of fact" indicates that a common question is one that "must be answered identically in each case in which it is presented." *Id*. at *6. In so stating, the court relied on the decision of the United States District Court for the Eastern District of Wisconsin in *Van Patten v. Wright*, 2009 U.S. Dist. LEXIS 60763 (E.D.Wis. June 30, 2009). In *Van Patten*, the court stated, "Although neither Rule 42 nor case law defines 'common question of law or fact,' the plain meaning of this phrase indicates that a common question is one that must be answered identically in each case in which it is presented." *Id*. at *3-4.

{¶166} This same court has held similarly in other cases. *E.g.*, *Habitat Edn. Ctr., Inc. v. Kimbell*, 2008 U.S. Dist. LEXIS 46377 (E.D.Wis. June 5, 2008); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 2011 U.S. Dist. LEXIS 67623 (E.D.Wis. June 22, 2011).

---

[10] To answer, when used as a transitive verb, means "to reply in rebuttal, justification, or explanation." *Merriam-Webster Online*, https://www.merriam-webster.com/ dictionary/answer (accessed June 1, 2026) [https://perma.cc/37G4-AC4G]. Whereas an answer, when used a noun, means "some spoken or written in reply to a question." *Id*.

{¶167} In *Habitat,* also cited by the majority, the court determined that four actions against certain public officials for approval of certain timber projects in the Chequamegon-Nicolet National Forest in violation of the National Environmental Policy Act and the National Forest Management Act presented some common questions of law or fact where all four appeals raised three identical questions concerning each project that would be resolved by looking to nearly identical or identical evidence and would not depend on "differences in the projects' administrative records." *Habitat* at 4-5, 15. Thus, the court found the presence of common questions of law of fact where the common questions between the actions could be uniformly answered through the same procedure, thus favoring expediency and economy. As specifically cited in the majority opinion, in doing so, the court even acknowledged that there "could be different answers to [the] question." *Id.* at 15. So, the court relied on the common process that would be involved in answering the common questions.

{¶168} While a common question of law or fact may at times lead to a common answer, there is no such mandatory requirement within the rule, and such heightened requirements should not be crafted by this court.

{¶169} When serving the purpose of the rule, the trial court should be afforded the discretion to determine whether there is a "common question of law or fact" between actions that can be resolved expediently together and without prejudice to the rights of the parties. *Wilson*, 2026-Ohio-2279, ¶ 99-102, 107-113 (1st Dist.) (Moore, J., dissenting).

## II. *The Actions Presently Before this Court*

{¶170} In the instant appeals, this court is once again presented with the question of whether the joining of two medical-malpractice actions against Durrani

54

was appropriate under Civ.R. 42. Durrani and CAST assert under the first assignment of error that the actions lack a common question of law or fact.

### A. Medical Malpractice Generally

**{¶171}** "'In order to support a claim for medical negligence, a complainant must submit evidence establishing the requisite standard of care, show that the physician negligently diverged from that standard, and demonstrate an injury proximately resulting from the physician's actions.'" *Bunn v. Hlubek*, 2025-Ohio-4563, ¶ 11 (1st Dist.), quoting *Gray v. Cincinnati Children's Hosp. Med. Ctr.*, 2024-Ohio-3168, ¶ 16 (1st Dist.).

**{¶172}** "[T]he standard of care applicable to medical professionals is to exercise the degree of care that a medical professional of ordinary skill, care, and diligence would exercise under similar circumstances." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 15, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), paragraph one of the syllabus. "As part of the standard of care, medical professionals are expected to be able to recognize certain symptoms of illness and injury, and they are expected to be aware of the associated risk of harm." *Id.* at ¶ 29, citing *Berdyck v. Shinde*, 1993-Ohio-183.

**{¶173}** Any negligent failure to meet that applicable standard of care constitutes medical malpractice if the negligence proximately results in an injury to the patient. *Berdyck* at ¶ 27, citing *Bruni* at 130. Thus, "[w]hether negligence exists is determined by the relevant standard of conduct for the physician." *Id.* "That standard is proved through expert testimony." *Id.*, citing *Bruni* at 131-132.

**{¶174}** "The expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances." *Schwind v. Ohio Dept. of Rehab. & Corr.*, 2022-Ohio-3995, ¶ 17 (10th

Dist.), citing *Gibson v. Ohio Dept. of Rehab. & Corr.*, 2019-Ohio-4955, ¶ 10 (10th Dist.).

### B. *This Court's Opinion in* Jones v. Durrani

**{¶175}** The majority opinion, and recently this court, appears to challenge our own precedent in *Jones*, 2024-Ohio-1776 (1st Dist.), and its progeny. *See Wilson*, 2026-Ohio-2279, ¶ 60-64, 69 (1st Dist.). In *Jones*, this court was first presented with the question of whether the joining of two medical-malpractice actions against Durrani was appropriate under Civ.R. 42. *Id.* at ¶ 18. Each plaintiff had substantially the same surgery in the L5-S1 area of the spine. *Id.* at ¶ 4-5, 8. They each brough suit against Durrani and alleged that "Dr. Durrani breached the requisite standard of care when selecting and performing the spine surgeries, failed to obtain proper informed consent prior to the surgeries, committed battery by performing unnecessary and uninformed surgery without proper consent, and induced plaintiffs to undergo the surgeries by fraudulently misrepresenting the need for surgery." *Id.* at ¶ 2. At trial, it was revealed that Durrani made largely overlapping "impressions" or representations regarding each plaintiff based on each plaintiff's medical imaging and history in order to justify the at-issue surgeries. *Id.* at ¶ 23-24.

**{¶176}** More specifically, Durrani made seven identical representations for each plaintiff, including (1) lumbar spinal stenosis, (2) back pain with radicular pain in the L5 distribution bilaterally, (3) very significant functional impairment, (4) anterolisthesis of L5 on S1, (5) central stenosis, (6) lateral recess stenosis, and (7) failure of conservative treatment. *Id.* Determining whether these impressions were in fact warranted for each plaintiff encompassed a large amount of competing expert testimony regarding the standard of care for making such representations. *Id.* at ¶ 25. Consequently, this court held that the joining of the two actions for trial was not

improper under Civ.R. 42 where—at a minimum—the standard of care for making such identical representations was a common issue of fact between the two cases and where each case presented the same claims against the same defendants based on the same theory of malpractice and/or fraud surrounding these conditions. *Id.* at ¶ 25-26.

{¶177} The court has held similarly in other cases where substantially similar issues were presented in similar cases. *See, e.g., Courtney*, 2025-Ohio-2335, at ¶ 49 (1st Dist.) (holding that the common-question-of-law-or-fact requirement was met where the plaintiffs had similar diagnoses and received essentially the same surgery and expert testimony detailed the complexities of the common diagnoses and surgeries); *Ravenscraft*, 2025-Ohio-2900, at ¶ 88 (1st Dist.) (holding that the common-question-of-law-or-fact requirement was met where the plaintiffs were both diagnosed with degenerative disc disease, spinal stenosis, and degenerative spondylolisthesis at the L5-S1 joint and the expert testimony focused on the presence or absence of any symptoms traceable to the L5-S1 joint); *Fenner*, 2025-Ohio-4477, at ¶ 49 (1st Dist.) (holding that the common-question-of-law-or-fact requirement was met where, although the plaintiffs did not have identical surgeries, each case involved a discussion of the impressions that were made by Durrani to warrant surgery, many of which were overlapping, including stenosis, spondylolisthesis, anterolisthesis, and neurogenic claudication).

{¶178} A federal court has also held similarly. S*ee Atwood v. UC Health*, 2019 U.S. Dist. LEXIS 216184, *15 (S.D. Ohio Dec. 17, 2019) (finding that Durrani and CAST were not entitled to a new trial on the basis of the alleged improper joining of six Durrani malpractice actions for trial where "determination of common questions of law and fact were borne out by Defendants' own witnesses" as "experts on both sides testified as to the many similarities of the symptoms, diagnosis and treatments

rendered.").

**{¶179}** The majority opinion suggests that *Jones* and its progeny merely encompassed "common facts," which were insufficient to warrant the joining of actions under Civ.R. 42. However, the majority opinion fails to acknowledge that these common facts created a common issue of fact as to the standard of care applicable to both actions. Each side presented competing expert testimony, through the same witnesses, on the relevant standard of care in relation to the overlapping representations made by Durrani for both plaintiffs based on their medical imaging and history. Notably, the failure to establish the recognized standards of the medical community is fatal to a claim of malpractice. *See generally Yung v. UC Health, LLC*, 2023-Ohio-789, ¶ 11 (1st Dist.), citing *White v. Summa Health Sys.*, 2008-Ohio-6790, ¶ 11 (9th Dist.). Thus, even under the requirements that the majority opinion crafts today for the joining of actions for trial under Civ.R. 42, the standard was met in these cases as the relevant standard of care was a substantial issue in the malpractice actions that would be answered uniformly and result in the same answer. Consequently, it cannot be said that *Jones* and its progeny were wrongly decided.

### C. *The Instant Cases*

**{¶180}** Nevertheless, the instant appeals now present this court with a joint trial that strays from our past precedent. Only one action, Eileen's, involved the standard of care surrounding Durrani's representations of her medical imaging and history. The other action, McClendon's, involved the standard of care surrounding the spinal fusion procedure performed on her by Durrani. Notably, the overlap in witnesses at trial for each action was miniscule in comparison to past cases that have come before this court and the essence of the records here shows that, unlike in past cases where the overlap in expert testimony undoubtedly served judicial efficiency,

each case here was essentially presented separately to the same jury, based on largely separate evidence. Thus, even assuming that there may have ultimately been a common question of law or fact between the two actions, the record does not reflect that the joint trial served any purpose of efficiency sufficient to warrant the joining of the two malpractice actions for trial under Civ.R. 42. Notably, any judicial efficiency served by a joint trial in such a situation would seem to be outweighed by the potential for prejudice and juror confusion. Therefore, I concur in the majority's judgment that these actions were wrongly joined for trial under Civ.R. 42.

{¶181} As I have noted in the past, such an error does not automatically result in a reversal as this court must still assess for harmless error under Civ.R. 61. *See Fenner*, 2025-Ohio-4477, at ¶ 145, fn. 14 (1st Dist.) (Zayas, J., concurring in part and concurring in judgment only in part).

{¶182} Nevertheless, I concur in the majority's opinion on cumulative error and thus concur in the majority's judgment to reverse these causes for new, separate trials based on the cumulative error reflected by the record and the arguments presented in these appeals.

### III. Conclusion

{¶183} Based on the foregoing, I concur in judgment only on the first assignment of error challenging the joint trial. Beyond that, I concur with the remainder of the majority opinion.